UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ZANE D. CROWDER,
     Petitioner,

vs.                       Case No.:  3:20cv5934/LAC/EMT

SEC'Y DEP'T OF CORR.,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner Zane D. Crowder's (Crowder) counseled amended habeas petition filed under 28 U.S.C. § 2254 (ECF No. 4). Respondent (the State) filed a motion to dismiss the petition as untimely (ECF No. 8), with relevant portions of the state court record (ECF Nos. 8-1 through 8-10 and 15-1 through 15-5). Crowder responded in opposition to the motion to dismiss (ECF No. 20).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of the timeliness issue, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the opinion of

the undersigned that the pleadings and attachments before the court show that the State's motion to dismiss should be granted, and the amended habeas petition dismissed as untimely.

## I.   BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF Nos. 8-1 through 8-10 and 15-5 through 15-5).[1] Crowder was charged in the Circuit Court for Escambia County, Florida, Case No. 2010-CF-2822, with one count of sexual battery (victim less than 12 years) (Count 1) and one count of lewd and lascivious molestation (victim less than 12 years) (Count 2) (ECF No. 15-1 at 28 (information)).  On January 21, 2011, a jury convicted Crowder of both Counts as charged (ECF No. 15-1 at 47 (verdict); ECF No. 15-3 (transcript of jury trial)).  The trial court sentenced Crowder as a sexual predator to life in prison on Count 1 and a concurrent mandatory minimum term of twenty-five years in prison on Count 2 (ECF No. 15-1 at 72–80 (judgment and sentence)). Crowder appealed the judgment to the Florida First District Court of Appeal (First DCA), Case No. 1D12-1478 (ECF No. 15-4 (Crowder's initial brief); ECF No. 8-1 (State's answer brief)).  The First DCA affirmed the judgment per curiam without

---

[1] The court refers to the document numbers and page numbers automatically assigned by the court's electronic filing system.

written opinion on February 3, 2012 (ECF No. 8-2 at 4 (decision)). *Crowder v. State*, 78 So. 3d 537 (Fla. 1st DCA 2012) (Table).  The mandate issued February 22, 2012 (ECF No. 8-2 at 3 (mandate)).

On December 28, 2018, Crowder filed a counseled motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 8-4 at 17–24 (motion)).  The circuit court summarily denied the Rule 3.850 motion in an order rendered on February 1, 2019 (*id.* at 29–33 (order)).  Crowder appealed the decision to the First DCA, Case No. 1D19-1280 (ECF No. 8-5 (Crowder's initial brief)).  The First DCA affirmed the lower court's decision per curiam without written opinion on December 4, 2019 (ECF No. 8-7 (decision)).  *Crowder v. State*, 289 So. 3d 870 (Fla. 1st DCA 2019) (Table).  The mandate issued February 25, 2020 (ECF No. 8-10 (mandate)).

Crowder commenced this federal habeas case on November 10, 2020 (*see* ECF No. 1).

## II.    DISCUSSION

A one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  *See* 28 U.S.C. § 2244(d)(1).  The limitation period runs from the latest of:

(A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  The time during which a properly filed application for state post-conviction or other collateral review is pending is not counted toward the one-year federal limitations period.  *See* 28 U.S.C. § 2244(d)(2).

The State contends the appropriate statutory trigger for the federal limitations period in this case is the finality date of the judgment, pursuant to § 2244(d)(1)(A) (*see* ECF No. 8 at 7).   Applying that trigger, Crowder's judgment of conviction becomes final, for purposes of § 2244(d)(1)(A), upon expiration of the 90-day period in which he could seek direct review of his conviction in the United States Supreme Court.  The 90-day period runs from the date of entry of the judgment sought to be reviewed.  *See* U.S. Sup. Ct. Rule 13; *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d

1273, 1275 (11th Cir. 2006). Calculating the finality date in Crowder's case, the 90-day period for seeking certiorari review in the Supreme Court was triggered by the First DCA's affirmance in the direct appeal, on February 3, 2012, and it expired ninety days later, on May 3, 2012. The federal limitations period commenced the next day, on May 4, 2012.[2] The limitations period ran untolled until it expired one year later, on May 4, 2013. *See Downs v. McNeil*, 520 F.3d 1311, 1318 (11th Cir. 2008) (limitations period should be calculated according to "anniversary method," under which limitations period expires on anniversary of date it began to run) (citing *Ferreira v. Dep't of Corr.*, 494 F.3d 1286, 1289 n.1 (11th Cir. 2007))

Crowder's counsel does not argue that a different statutory trigger for the federal limitations period applies and appears to concede that Crowder's § 2254 petition is untimely. Crowder states he is presenting a "gateway actual innocence claim" to obtain a merits review of his otherwise time-barred claims (i.e., a "freestanding" actual innocence claim asserted in Ground 1 and two claims of ineffective assistance of counsel asserted in Grounds 2 and 3), pursuant to

---

[2] Federal Rule of Civil Procedure 6(a) provides that "[i]n computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included." Fed. R. Civ. P. 6(a); *see also Washington v. United States,* 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) (*see* ECF No. 4 at 7).  Crowder premises his "actual innocence" claim on "newly discovered evidence" he obtained in "early 2017" (*id.* at 4).  Crowder states at that time, he learned from an individual named Donna Forbes, that Linda Kahl, a forensic interviewer who interviewed the victim in Crowder's case and the alleged victim in Forbes' husband's case, had admitted during a deposition that she did not always follow the state mandated guidelines for child protection teams (*id.* at 4–5).[3]  Donna Forbes told Crowder that after Ms. Kahl's deposition, the State dropped the capital sexual battery charge against her (Forbes') husband (*id.*).  Crowder contends if he had been aware of this "newly discovered evidence" (i.e., Ms. Kahl's admissions during her deposition in the *Forbes* case), he would have used it to exclude admission of Kahl's testimony and/or to impeach her trial testimony (*see* ECF No. 4 at 5; ECF No. 20 at 1–2).

---

[3] A transcript of Ms. Kahl's deposition in the *Forbes* case is part of the state court record (ECF No. 8-4 at 84–102).  The deposition occurred on May 20, 2016, concerning an interview Kahl conducted on August 11, 2015 (*id.* at 88).  During the deposition, Ms. Kahl testified that the Child Protection Team in Escambia County, where she was one of several case coordinators, followed the American Professional Society on the Abuse of Children (APSAC) Guidelines and Protocols (*id.* at 87, 98).  Ms. Kahl testified that the case coordinators in the Escambia County CPT did not do the following, even though the APSAC Guidelines and Protocols recommended they do so:  (1) perform a "social assessment" of the child, (2) explore "alternate hypotheses" during the interview with the child, (3) conduct specialized interviews with adults who interacted with the child, and (4) gather independent information from all of the child's principal family members (*id.* at 92, 94, 96, 98).

Under the AEDPA, a "credible showing of actual innocence" provides a "gateway" through which a petitioner may pursue his claims on the merits notwithstanding his failure to file his habeas petition within the statute's otherwise applicable limitations period. *McQuiggin*, 566 U.S. at 386. To pass through this gateway, however, a petitioner must satisfy the standard for actual innocence articulated by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298 (1995). Under *Schlup*, a petitioner must show that, in light of newly presented evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," *id.* at 327, or, to remove the double negative, "that more likely than not any reasonable juror would have reasonable doubt," *House v. Bell,* 547 U.S. 518, 538 (2006).

*Schlup* makes clear that, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324. This new evidence must do more than counterbalance the evidence that sustained the petitioner's conviction. *See Sibley v. Culliver*, 377 F.3d 1196, 1207 (11th Cir. 2004) (concluding that even if new evidence showed that the murder victim was the aggressor, "a reasonable juror could still quite possibly have concluded that

[petitioner] acted with murderous intent, rather than out of self-defense"). The new evidence must be so significant and reliable that, considered with the trial record as a whole, it "undermine[s] confidence in the result of the trial." *Schlup*, 513 U.S. at 327 (internal quotation marks omitted).

Crowder acknowledges that in *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992), the Supreme Court stated that newly discovered impeachment evidence, which is the type of evidence Crowder relies on here, will "seldom, if ever" support an actual innocence claim (*see* ECF No. 20 at 1). But Crowder contends the impeachment evidence is this case satisfies this "rare exception" (*id.*).

Crowder argues that in *Calderon v. Thompson*, 523 U.S. 538, 563 (1998), the Supreme Court described circumstances in which new evidence, although removed from the crime and tending only to impeach, may demonstrate a miscarriage of justice: (1) there was little evidence of the crime apart from the testimony to which the new impeachment evidence related, and (2) the jury accepted the testimony (to which the new impeachment evidence related) without reservation. 523 U.S. at 563.

In *Thompson*, the petitioner was convicted of raping and murdering the victim. 523 U.S. at 541. Thompson attempted to satisfy the "miscarriage of justice" exception to a procedural bar by presenting additional evidence to impeach the credibility of two "jailhouse informants," Fink and Del Frate, who testified that

Thompson confessed the rape and murder to them. *See id.* at 562. With respect to Fink, Thompson presented additional evidence of Fink's history as an informant and of law enforcement favors for Fink. *Id.* Thompson also presented statements by law enforcement officials to the effect that Fink was an unreliable witness. *Id.* With respect to Del Frate, Thompson presented evidence that law enforcement officials and certain members of Del Frate's family regarded Del Frate as dishonest, that Del Frate shared a jail cell with David Leitch (Thompson's former roommate who knew many details about the rape and murder) prior to meeting Thompson, that Del Frate's statements to police tracked newspaper accounts of the crime, and that Del Frate neglected to mention at trial his prior convictions for grand theft and distribution of hallucinogens without a license. *Id.* at 562–63.

The Supreme Court analyzed Thompson's new impeachment evidence as follows:

> This impeachment evidence provides no basis for finding a miscarriage of justice. As in *Sawyer*, the evidence is a step removed from evidence pertaining to the crime itself. 505 U.S. at 348, 112 S. Ct. at 2523–2524. It tends only to impeach the credibility of Fink and Del Frate. To find that these matters in all probability would have altered the outcome of Thompson's trial, we should have to assume, first, that there was little evidence of rape apart from the informant's testimony; and second, that the jury accepted the informants' testimony without reservation. The former assumption is belied by the evidence recited above. The latter one is belied by the substantial impeachment evidence Thompson's attorney did introduce.

With regard to Fink, Thompson's trial counsel presented the following evidence:  Fink had four prior felony convictions and had spent a total of 14 years in prison at the time of trial.  He used heroin on a frequent basis during the 15 years preceding trial, including the period in which he gave his statement to police.  He lied about his identity as a matter of routine.  He acted as an informant on numerous other occasions, including one occasion where he informed on another inmate to gain protective custody in prison.  He requested and received a transfer to another penal facility in exchange for his statement against Thompson.  And he admitted being unable to explain why criminals confessed to him with such frequency.

With regard to Del Frate, Thompson's trial counsel presented the following evidence:  Del Frate had served time for second-degree murder and credit card forgery.  At the time of trial, Del Frate faced felony charges in Ohio and California.  Del Frate admitted claiming another murderer confessed to him during the period in which Thompson confessed to him.  He also admitted changing his account of Thompson's confession to him numerous times.  Given the trial evidence impeaching each informant, we would disrespect the jury in Thompson's case if we were to find that, had it been presented with still more impeachment evidence, it would have reached a different verdict.

523 U.S. at 563–64.

Crowder argues that in contrast to the circumstances in *Thompson*, there was no evidence of a crime "apart from the alleged victim's testimony—which was initially obtained and framed as a result of Linda Kahl's forensic interview" (ECF No. 20 at 2).   Crowder mischaracterizes the evidence.   The victim's **initial** description of the molestation was **not** obtained as a result of Linda Kahl's CPT interview.  Rather, the trial transcript demonstrates that the victim, S.E., initially

disclosed Crowder's sexual molestation to Terrie Webb (whom S.E. referred to as "Nana") and S.E. then disclosed it to her step-father, Arlington (Abe) Levi (*see* ECF No. 15-3 at 38–120). Two days **after** these disclosures, S.E. was interviewed by Linda Kahl.

Terrie Webb testified that S.E. spent a lot of time in her home and was close to her daughter Courtney (ECF No. 15-3 at 41). Ms. Webb testified that on March 14, 2010, S.E. and Courtney were playing in the backyard and then came inside, and Courtney said, "Mom, you need to talk to [S.E.]" (*id.* at 42–43, 48–49). Ms. Webb testified Courtney went back outside, and she (Webb) and S.E. sat at the kitchen table (*id.* at 42–43). Ms. Webb testified that S.E. appeared timid, "like she was going to get in trouble" (*id.* at 43). Ms. Webb described her conversation with S.E.:

Q [by the prosecutor]. How did the conversation start?

A [by Terrie Webb]. [S.E.] said, do you know my daddy's friend, Zane? I said, yes. And she said—

Q. Did she open up immediately to you?

Q. No. It took a little bit. I had to keep asking her to speak up. I had to reassure her a couple of times that she was not in trouble, that we were just talking and she needed to tell me what was going on.

Q. And so what did you say when she asked you if she knew— if you knew her dad's friend, Zane?

A. I told her, I said, yeah. And she said, well, he touched me. I said, well, what do you mean? Did he touch you—she said, he touched me. I said, well what, did he pat you on your shoulder or touch your leg, you know? What are you talking about? She said that he had touched her privates. I asked, well, what exactly do you mean "touched your privates." And she put her hand on the front of her jeans in the crotch area. I said, well, do you mean he touched the front of your jeans? She told me, no, that he had pulled her pants down and touched her privates.

Q. What was her demeanor like when she told you?

A. She was scared. She acted like she was going to be in trouble. She kept talking real low.

Q. Did you have to ask her to speak up so you could hear her?

A. Yes.

Q. Did she want to talk about it?

A. Not really. But when I asked her, you know—I had to ask her what exactly are you talking about, you know, she—me and her finally got it out.

Q. Did she cry?

A. Yes. She cried when she told me what he had done to her.

Q. Was the way she was acting unusual for her?

A. Yeah. She was—she's usually a very happy, outgoing child. And, you know, when she—when she looked at me and said, you know—looked me in my face and told me that, you know—

Q.  Well, let me ask you.  After she told you that Zane had touched her on her private area and indicated on the skin of her private area, did she tell you anything else after that?

A.  Yes. I had asked her, you know, what exactly are you talking—you've got to tell me what's going on.  And she had told me that he had put his finger inside her.

Q.  Did you ask her where or when this happened?

A.  She had asked— she had told me that she was at her mom's house, and that Danielle [S.E.'s mother] had went to the store and Zane would watch her and her brother [Jaron].  And he would have Jaron go into his bedroom and have [S.E.] in the front room, and that's when it would happen.

Q.  Did she tell you how many times it had happened?

A.  She didn't tell me how many times it happened.  She just told me more than once.

Q.  What did you tell her after she told you all of this?

A.  I told her that she was not in trouble.  This was not her fault.  That she needed to, you know, understand that she didn't ask for this to happen.

Q.  Did you make sure she understood the gravity of what she was telling you?

A.  Yes.  I talked to her, and I said, do you—are you sure you're telling me the whole truth because this is very big and, you know, that Zane could get in a lot of trouble?  So you need to make sure that you're telling me everything.  She did; she told me everything.

Q.  After this conversation, what did you do?

A.  I called her mom and her step-dad, Abe.

(ECF No. 15-3 at 44–46).  Ms. Webb testified that Abe came to her house and talked

to S.E. on the front porch (*id.* at 47).  She testified that S.E.'s biological father,

Raymond Ellis also came to see S.E. that evening (*id.*).

On cross-examination, Ms. Webb testified that S.E. did **not** tell her the

following:  (1) that Zane touched her in on the "back" of her privates, (2) that the

molestation occurred at "Christina's" house, (3) that Zane put things other than his

fingers inside of her, or (4) that Zane threatened her (ECF. No. 15-3 at 49–50).

Danielle Levi, S.E.'s mother, testified that Zane Crowder was her husband's

best friend (ECF No. 15-3 at 61).  Levi testified that Crowder spent a lot of time at

their home in the spring and summer of 2009, and even spent the night (*id.* at 62–

63).  Ms. Levi testified there were times when Crowder was at the home alone with

S.E., for example, when she (Levi) went to the store or to get her nails done (*id.* at

64).  Ms. Levi testified that in August of 2009, she, Abe, and S.E. stayed at her friend

Christina's house (*id.* at 65).  Levi testified that Crowder spent the night there as

well, and he slept in the living room, and S.E. slept in a room off the living room

(*id.*).

Ms. Levi testified that after Terrie Webb told her what S.E. said, she called

S.E.'s father, Raymond, and Abe went to see S.E. at Terrie's house (ECF No. 15-3

at 67).  Levi testified that Abe contacted the police approximately an hour and a half later, once Raymond arrived at Webb's house (*id.*).  Ms. Levi testified that S.E. did not speak with the responding officer, but S.E. spoke with an investigator from child protective services (Jennifer Walker) the next day, and then had an interview at the Gulf Coast Kid's House (the CPT interview with Linda Kahl) the day after that (*id*).

Ms. Levi testified that in hindsight, two unusual events occurred.  First, S.E. had come into Levi's bedroom and told her that she didn't want to sit on Crowder's lap to use the computer (ECF No. 15-3 at 68).  Levi testified she interpreted S.E.'s comment as wanting to be more independent (*id.*).  Second, approximately three or four days prior to S.E.'s disclosure, Crowder came to a mutual friend's house (Tina Taylor) when Levi and S.E. were also there; and when S.E. saw Crowder, she turned around and walked the other direction  (*id.* at 64–65, 69).

Arlington "Abe" Levi testified he and Crowder had been friends since childhood (ECF No. 15-3 at 78–79).  He testified that when Terrie Webb told him and Danielle about S.E.'s disclosure, he was "extremely upset" and immediately went to Webb's house (*id.* at 81).  Levi testified that S.E. was "worried and upset" (*id.* at 81–82).  Levi testified he asked S.E. to tell him what Crowder did, and S.E. told him the following:

She told me that he had touched her in her private area.  I asked her how and when—how was he able to do it with us around.  And she said he did it whenever we would be gone or whenever we were sleeping at night to go fishing.  It happened several times when we were going to go fishes [sic], and it happened several times whenever my wife was picking up boxes or going to the store to get some supplies for the house.

Q [by the prosecutor].  Did she tell you where it would happen?

A.  She told me it had happened in the room where the couch was that he had stayed on the nights that he slept over.

Q.  Is that in the den?

A.  Yes, sir, in the den— in the computer room.

Q.  Now, where did she tell you he would touch her?

A.  In the room—

Q.  I'm sorry. Where on her body?

A.  She said on her private and on her panties.

Q.  Now, when—did she tell you about another time where it happened?

A.  She also said that we had spent—when me moved out and we moved into a friend's house, she said that he had done it that one night, the only night he had stayed over.

Q.  At whose house?

A.  Christina.

Q.  And did she tell you that you guys were asleep at the time?

      A.  Yes, sir.

      Q.  Did you ask her if it happened more than one time?

      A.  Yes, sir, I did.

      Q.  What did she say?

      A.  She said just one time at Christina's, but more than ten times at the house.

      Q.  And did you say anything to her to impress upon her the gravity of what she was saying?

      A.  Yes, sir, I did.

      Q.  What did you say?

      A.  I let her know that this was a very serious thing and that we really needed to know exactly what had happened and she needed to tell us.  Because we were going to have to call the cops and go to court and go through a lot of stuff.
. . . .

      Q.  I'm sorry.  Let me just go back a little bit.  What about S.E. tell [sic] you Zane touched her with?

      A.  His fingers.

(ECF No. 15-3 at 82–84).  Mr. Levi testified he called the police immediately after talking to S.E. (*id.* at 85).

On cross-examination, Abe Levi testified that S.E. told him that Zane had placed objects inside of her (ECF No. 15-3 at 90). He testified that S.E. told him that Zane would hold her legs down when she kicked them (*id.* at 91).

S.E. testified in person at trial. She testified that Zane was her stepdad's friend and spent time with her family (ECF No. 153 at 108–09). S.E. testified regarding the molestation as follows:

> Q [by the prosecutor]. Did Zane ever do anything to you that he should not have done?
>
> A. Yes, sir.
>
> Q. What would he do?
>
> A. He would touch me in my lower private part.
>
> Q. Okay. And just to be clear for the record, when you say your "lower private part," do you mean your vagina?
>
> A. Yes, sir.
>
> Q. What would he touch with you?
>
> A. His finger.
>
> Q. And when he touched you, where would you be generally?
>
> A. In the den.
>
> Q. Was that where it happened mostly?
>
> A. Yes, sir.

Q.  Where in the den?

A.  On the couch.

Q.  And when he touched you, would anyone else be around?

A.  No, sir.

Q.  Where was your step-dad normally when this happened?

A.  At work.

Q.  And was your mom home?

A.  She would be going to the store or taking someone home.

Q.  And where would your brother be?

A.  In his room watching TV.

Q.  And would Zane tell you to do anything before it happened?

A.  Yes, sir.

Q.  What would he tell you to do?

A.  Close your eyes.

Q.  And when you [sic] told you to close your eyes, what did you do?

A.  Touched me in my lower private part.

Q.  Would he touch you on your skin?

A.  Yes, sir.

Q.  And just to be clear, when he touched you on your lower private part, was it on the skin of your lower private part?

A.  Yes, sir.

Q.  And would he ever touch on the inside of your lower private part?

A.  Yes, sir.

Q.  Would he also touch you on the outside?

A.  Yes, sir.

Q.  Did he ever touch you with any other part of his body than his finger?

A.  No, sir.

. . . .

Q.  No?  And did he tell you anything when he did that to you?

A.  To close my eyes.

Q.  Did he ever tell you not to tell?

A.  Yes, sir.

Q.  Did it ever happen anywhere else other than at your house?

A.  Uh-huh (Indicating Affirmatively).

Q.  Where else did it happen?

A.  When I moved out of my house, at my mom's friend's house.

Q.  What was her name?

A.  Christina.

Q.  Was there a night that Zane slept over at Christina's house?

A.  Yes, sir.

Q.  And was it that night that it happened?

A.  Yes, sir.

Q.  What happened that night?

A.  He came into my bedroom and he came to my bed, and he touched me in my lower private part.

Q.  Do you remember what you were wearing?

A.  A nightgown that told you how to brush your teeth and some frog shorts.

Q.  Did he touch you on the skin of your private part?

A.  Yes, sir.

Q.  Were your parents home that night?

A.  Yes, sir.

Q.  Where were they?

A.  They were in their room sleeping.

Q.  Was that the last time it happened?

A.  Yes, sir.

(ECF No. 15-3 at 109–12).  S.E. testified she tried to tell her mom what had happened, but her mom was making dinner and didn't seem to understand what she was saying (*id.* at 112–13).  S.E. testified she then told Courtney (*id.* at 113).

On cross-examination, S.E. testified she told Terrie Webb that Zane touched her "in the front and in the back" (ECF No. 15-3 at 116).  S.E. testified that what she said was true (i.e., that she was touched in the front and the back) (*id.*).  S.E. testified she was touched in the back only once, but she forgot to say that during her interview at the Gulf Coast Kid's House (*id.* at 116–17).  S.E. denied that she told Abe that Zane put anything inside her except his finger (*id.* at 117).  S.E. testified that her friend had been molested (*id.* at 117–18).  S.E. testified that when she spoke to Jennifer Walker (the child protective services investigator), she was untruthful about two things, one, that her mom did not smoke, and two, that Abe did not smoke (*id.* at 118).  S.E. testified she was untruthful because she did not know Walker (*id.* at 118–19).  S.E. testified she told the truth about these matters the next day (during the CPT interview) (*id.* at 118).

On redirect examination, S.E. testified that when she talked to "Nana" and her step-dad, she only told them things that "really happened" and did not tell anyone things that did not really happen (ECF No. 15-3 at 122).  S.E. testified that everything

she described in her testimony "really happened" (*id.* at 123).  She testified that Zane

did not touch her with anything except his finger (*id.*).

Linda Kahl testified she was a case coordinator with the CPT (ECF No. 15-3

at 134).  She testified she had conducted 40–50 forensic interviews (*id.* at 136).  Ms.

Kahl testified she began each interview by building rapport with the child so he or

she felt comfortable communicating, for example, by asking the child questions

about school and activities that the child likes and doesn't like (*id.* at 137–38).  Ms.

Kahl testified she then talked to the child about "ground rules":

> After rapport building, we talk about important things to remember
> while we're in the interview room, discuss with the child that if I were
> to say something wrong, make sure they correct me.  If they don't know
> an answer to something, to let me know that they don't know the
> answer.
>
> And the most important thing that we ask the child to do is to
> only talk about things that really happen, and we obligate the child the
> tell the truth while they're talking.

(ECF No. 15-3 at 138).  Ms. Kahl testified she never suggested any answers to the

child (*id.* at 139).  She testified she tended to ask open-ended questions (*id.*).

Ms. Kahl identified and authenticated the audio/video recording of her

interview with S.E., and the video was published to the jury (ECF No. 15-3 at 140–

63).  The interview began with Kahl asking S.E. about her age, school, best and

worst subjects in school, best friend, and parents (*id.* at 142–45). Kahl then told S.E.

the "ground rules":

> Let me tell you, [S.E.]. I told you this is my talking room and there's some important things for us to remember what [sic] we're in the talking room today.
>
> I'm going to be asking you a lot of questions as I already am. If I ask you a question and you don't know the answer, just tell me you don't know the answer. Don't guess, okay.
>
> A [by S.E.]. I kind of didn't want to tell Ms. Jennifer [Walker] some things.
>
> Q [by Kahl]. Okay. Well you can tell me anything. We're gonna [sic] keep talking, okay? We'll talk about that in a minute.
>
> And if I say something wrong, correct me. Don't let me think that I'm saying something that's right if it's not right, okay?
>
> A. Uh-huh.
>
> Q. And it's real important to remember that everything we talk about in here today is the truth, okay?
>
> A. (Nods Head Affirmatively).
>
> Q. So tell me why you're here to talk to me today.
>
> A. Because today I'm here to have an appointment with a doctor because my dad had a friend [S.E. later clarified that it was a friend of her step-dad's] that he didn't know that he was doing something wrong, and he was touching me in places that he shouldn't be touching me.
>
> Q. So a friend of your dad's?

A.  But now he is not his friend.  He's probably going to go to jail.

Q. What's this person's name?

A.  Zane.

. . . .

Q.  . . . And tell me what Zane did.

A.  He was touching me in places he shouldn't be touching me.

Q.  Tell me what you mean by that.

A.  He was touching me in my—I don't have a name for it.  But he was touching me in one of my privates.

Q.  Can I show you something?  It's interesting you said that because I have a picture that I want to show you, okay?  It's not a very good picture, but, believe it or not, this is a girl.  This is the front of a girl, and this is the back of a girl.  Can you tell me where he was touching you at?  Can you point to me on the diagram?

A.  (Witness complies).

Q.  You say you don't have a name for it; but what do you call that?

A.  I just call it something.  I don't know what to call it.

Q.  You don't know what you call it?

A.  No.  I don't call it nothing.  I just call it the privates.

Q.  Can we call it your privates for what we're talking about today?

A.  (Nods head affirmatively).

. . . .

> Q.  Tell me about what Zane did.

> A.  He told me to shut my eyes for some things, and he just kept on telling me, well, hurry up.  And my mom and dad—my dad would be at work and my mom could be telling people—not telling people about Zane, but taking people somewhere.

(ECF No. 15-3 at 145–48).

S.E. told Ms. Kahl that Zane touched her private more than once (ECF No. 15-3 at 148).  S.E. testified she did not remember the first time Zane touched her, but she remembered she was six years old (*id.*).  Ms. Kahl asked where she was living at the time, and S.E. responded her house (*id.*).  Ms. Kahl asked if she remembered the time of year it happened, and S.E. said she was in school, and it was when Zane lived with them (*id.* at 148–49).  Ms. Kahl asked what happened that day, if she remembered (*id.* at 149).  S.E. responded she didn't remember (*id.*).  Ms. Kahl asked if she remembered what happened when the last time was that Zane touched her private, and S.E. shook her head negatively (*id.*).  Kahl asked if S.E. could tell her what happened any time that Zane touched her privates, but S.E. did not respond (*id.*).  Ms. Kahl continued:

> Q.  Let me tell you, [S.E.], you're not in any trouble today for anything that we talk about.  We just want to make sure that you're safe.  That's why we need to make sure.

A.  My nana already told me that he was trying to see if I got hurt.

Q.  We have to talk about some things first before we do anything else, okay?  So I need to know what happened with Zane, if you could kind of explain to me when you say he touched you on your private.  So I know what happened, if you can tell me what happened.

A.  He—I was going to ask you if you were going to ask me was it on the inside or outside.

Q.  That's what I want you to talk with me about.  You tell me what happened.

A.  It was on the inside parts.

Q.  Okay.  So you were at your house.  You don't remember—

A.  It was in the room that he was living in.  It was just kind of the living room.  It was called our den.

Q.  Okay, and you were in the den.  But he was staying in that room?

A.  (Nods Head Affirmatively).

Q.  And what happened?

A.  It didn't have a door.

Q.  Okay.

A.  And he—

Q.  Tell me from the beginning to the end what happened.

A.  The beginning he would be touching me on it, and then he would be telling me to go to take a nap.

Q.  He would be touching you on it with—did he touch you with your clothes on or with your clothes off?

A.  They were on.

Q.  They were on?  Did he touch you on your clothes or on your skin?

A.  On my skin.

Q.  On your skin.  And when you say he touched you, did he touch you with a part of his body or with something else?

A.  With a part of his body.

Q.  Do you know what the part of his body was that he touched you with?

A.  His finger.

Q.  With his finger?  Okay.  So just to make sure that I'm getting this right, okay—you correct me I'm [sic] wrong—you said that Zane touched you on your skin on your front private with his finger?

A.  (Nods Head Affirmatively).

Q.  And did he touch you on the outside of your private or on the inside of your private—

A.  In.

Q.  —if you understand what that means?

A.  In.

Q.  On the inside of your private?  Did what Zane do, did it hurt or did it not hurt?

A.  It didn't hurt.

(ECF No. 15-3 at 149–52).  S.E. told Ms. Kahl she was on the couch in the den when

this happened (*id.* at 152).  Ms. Kahl asked S.E. to explain how Zane touched her

skin if she had her clothes on:

Q.  And you said you had your clothes on, but he touched you on your skin.  Kind of explain to me how, if he [sic] had your clothes on, he got to your skin.  How did that happen?

A.  He would tell me to go change into, like, some shorts and then sit down on the couch.  Because it was hot in the house.  He worries about me, but I don't know why he did that.  And he would tell me to close my eyes, and I don't know how he got to my skin.

Q.  You don't know how he got to your skin because your eyes were closed.  So he told you to clothes [sic] your eyes?

A.  Uh-huh (Indicating Affirmatively).

Q.  Did he say anything else to you other than to close your eyes?

A.  To keep them closed.

. . . .

Q.  But you know it was his finger that went inside your private?

A.  (Nods Head Affirmatively).

(ECF No. 15-3 at 152–53).  Ms. Kahl asked S.E. if she knew about how many times this happened with Zane, and S.E. shook her head negatively and said, "Maybe above fifteen" (*id.* at 153).

Ms. Kahl asked S.E. if she remembered when the last time was that it happened, and S.E. responded that it was at Christina's house when Zane spent the night (ECF No. 15-3 at 153–54).  Ms. Kahl asked S.E. if she could tell her what happened that time:

> Q.  Can you tell me about that time?
>
> A.  He went into my room while I was asleep and did it.
>
> Q.  This was at your mom's friend's, Christina's house?
>
> A.  When we lived there.
>
> Q.  And he came into your room while you were sleeping; is that what you said?  I don't want to get it wrong.
>
> A.  That's what I said.
>
> Q.  Okay.  And what happened?  What did he do?
>
> A.  That same thing.
>
> Q.  He did the same thing?
>
> A.  (Nods head affirmatively).  But he didn't tell me to change. I was already wearing the shorts and my shirt because it was hot.
>
> Q.  Okay.  And he touched you inside your private?

A.  (Nods Head Affirmatively).

Q.  With his finger?

A.  No.  He touched me outside that time.

Q.  Outside that time?  Okay.

. . . .

Q.  Did Zane ever touch you anywhere other than on your front private part?

A.  No, ma'am.

Q.  No, ma'am?

Did Zane ever touch you with anything other than his finger on any part of your body?

A.  (Shakes head negatively).

(ECF No. 15-3 at 155).

Ms. Kahl then circled back to S.E.'s statement at the beginning of the interview, that she didn't want to tell Jennifer (Walker) some things.  S.E. told Ms. Kahl that Jennifer asked if her mom and dad smoked (ECF No. 15-3 at 155).  S.E. told Ms. Kahl that she told Jennifer no because she (S.E.) was shy and didn't know Jennifer well (*id.* at 155–56).  Ms. Kahl asked S.E. if she wanted her (Kahl) to tell Jennifer, and S.E. responded, "Yes.  You can tell her I didn't mean to lie" (*id.* at 157).

Ms. Kahl asked S.E. if she told anyone about what Zane did (ECF No. 15-3 at

157). S.E. responded:

> Yes. I told my nana—well, I told my mom, but that was the first
> person I told. We were just getting out of a bath and—I was just getting
> out of the bath while she was using the bathroom, so I told her that but
> she was in a rush to get the dinner done.

> Q. What did you tell her?

> A. I told her what Zane has been doing to me; she just didn't
> hear it.

> Q. She wasn't paying attention to you?

> A. But this time she actually paid attention.

(ECF No. 15-3 at 157–58). S.E. told Ms. Kahl that she told Courtney, Courtney's

mom, her (S.E.'s) dad, and Jennifer (Walker) (*id.* at 158).

Ms. Kahl paused the interview and then resumed:

> Q. Can I ask you just a couple of more questions, [S.E.]?

> A. Uh-huh (Indicating Affirmatively).

> Q. Remember back when we were talking a little bit ago—is that
> water?

> A. Uh-huh (Indicating Affirmatively).

> Q. Cool—about when you were on the couch and Zane made
> you close your eyes is what you said.

> A. Uh-huh (Indicating Affirmatively).

Q.  Did he say anything other than close your eyes?

A.  (Shakes head negatively).

Q.  Did he say anything else to you about anything else that he wanted you to do or did he do anything else?

A.  He didn't me [sic] to do anything.  Well, actually he did.

Q.  Did he say anything, like, what would happen if you didn't close your eyes?  You can tell me.

A.  He said he would torture me.

Q.  He said would he torture you if you didn't close your eyes?

A.  I need a green [crayon].

Q.  Is there no green?  I'm sorry.

Do you know—did he tell you what he meant when he said he would torture you if you didn't close your eyes?

A.  I know what he meant.  He would, like, bruise me.

Q.  He said that?

A.  I already know what bruise means.  I know what he meant.  He meant he would bruise me, and I didn't tell nobody until this— yesterday.

Q.  So he said he would torture you if you didn't close your eyes?

A.  And he didn't torture me.

Q.  Because you closed your eyes.

A.  And plus, if he tortured me, he would be dead right now.

Q.  He would be dead right now?

A.  Uh-huh (Indicating Affirmatively).  He didn't hurt none [sic] of my body parts, but (unintelligible) just to check if he did.

(ECF No. 15-3 at 159–60).  As Ms. Kahl was ending the interview, S.E. said "this happened to one of my friends before" in the first grade (*id.* at 162).  S.E. said she told her "Nana" about her friend (*id.*).

Defense counsel questioned Ms. Kahl about her interview techniques as follows:

Q.  Now, when you—your true/false test, you know the test that you give to determine whether or not the child is—understands being truthful, the test that you give them is whether they agree with you that the pen is blue or not blue, right?  Like, for example, if you were the child, I would say, is my blouse white?  Is that true or not true?  That would be the test.

A.  And I don't even always actually do the test.

THE COURT:  Just answer her question, though.

THE WITNESS:  Yes, that would be the type of test.  Yes.

Q (by defense counsel, Ms. Cashwell).  So whether the child is four years old or they're eight years old or they're seven years old in geometry, you ask them—I mean, the color test is what test is administered to decide whether or not that child really understands the importance of telling the truth?

A.  It could be.

Q.  In this case you gave [S.E.] a color test?

A.  I did not.

Q.  You didn't ask her any questions about whether or not she understood the importance to tell the truth?

A.  I only obligated her to tell the truth.

Q.  You told her, you gotta [sic] tell the truth, right?

A.  Yes.

. . . .

Q.  And the other thing that you're doing is that the purpose of this forensic interview is so that the child is not interviewed multiple—a multiple number of times, like more than three times, for example?

A.  I don't know that that's why I'm doing that interview.  Our hope is that she doesn't have to be interviewed numerous times. Correct.  I don't think that answered your question.

Q.  The whole thing—you know about the research—or do you know about the research that a child not be interviewed more than three times or asked the same question more than three times.  Are you familiar with that?

A.  No, I'm not.

. . . .

Q (by Ms. Cashwell).  Ms. Kahl, the object, when you're doing an interview of a child, is not to be leading or in any way let the child know what sort of answer is acceptable and not acceptable; would that be fair?

A.  Correct.

Q.  And during your years of interviewing children, have you found that when the child is asked the same question twice, maybe three times in a row, that the child may think, okay, I'm not giving the correct response, so let me change my response?

A.  That can happen.

Q.  Now in this case, when you were questioning [S.E.], were you careful not to re-ask the same questions once you got an answer from [S.E.]?  Or do you know?

A.  I think I have a tendency to often say back to the child what they said to me, if that's what you're asking me.

Q.  No. I'm asking you if you got a response from [S.E.] for a question.

A.  Correct.

Q.  For example, you asked [S.E.] at the very beginning, do you remember the very first time it happened, and she said no.  And then you said, do you remember the last time it happened, and she shook her head no.  Did you ask her that question again?

A.  Yes, I did.

Q.  And do you think that it is possible that [S.E.], when you asked her again, do you remember the last time it happened, that that was a way of letting the child know, okay, that answer is not acceptable; I need an answer here?  Is that possible?

A.  That's possible.

Q.  Now, when you left the—when you left the room and then you came back, you remember that?

A.  Yes.

Q.  And when you left of the room and you came back, and one of the first questions that you asked her is, you said, was there anything else that Zane said to you; do you remember that?

A.  Yes.

Q.  And her answer was no.

A.  Correct.

Q.  And then you asked the question again anyway.  Is there anything else that Zane said to you, and she said, close my eyes.  You said, well, is there anything other than close my eyes that she said to you, and she said no.  And you asked it another time.  And you said, is there anything he said he would do to you if you didn't close your eyes.
. . . .
A. . . . I think I was asked in the observation room to try to ask that question . . . .
. . . .
Q.  Now, when the child—and, you know, I'm not trying to pick on you.  But, on the other hand, when the child said something to you like at the very—at the very end and says, this has happened to one of my friends before in first grade, there was no follow-up by you asking her, well, what did your friend tell you?  When did your friend tell you this?  Is that influencing what you're doing today?  There was no follow-up for that type of question.  Now is that standard protocol for the Child Protection Team?

A.  That normally doesn't happen. I don't know that that's ever happened to me before, but that wasn't a conversation that I felt I needed to have with the child.  I did talk to the CPI [Jennifer Walker] about that, and we had a conversation that she would follow-up with in [sic] her investigation of that.

Q.  Well, let me ask you this.  Another strange thing happened during the course of your interview with the child.  You had asked her,

do you remember the first time?  She says, no.  Do you have any memory of the last time?  No.  And then you say, well, can you describe at least one incident?  Rather than describe one incident, she comes back at you and she says, I thought you were going to ask me inside or outside.  Do you remember that?

A.  Yes.

Q.  And there was no follow-up from you asking her, who told you that this question is going to be asked.  Do you remember that?

A.  Yes.

Q.  Was that a conscious decision on your part?

A.  We're kind of trained to stay away from, like—I don't want to say like a blaming-type question.  But I didn't want to divert that back to something that wasn't so much talking about her and what she was talking about.  I just kind of felt like that would have been not a good question to ask her back.

Q.  The good questions that you wanted to stay focused on is to get some sort of disclosure from her; would that be fair?

A.  If there was disclosure to be made, yes.

(ECF No. 15-3 at 164–66, 171–75).

The defense called Jennifer Walker Krumbein as a witness (ECF No. 15-3 at 203).  Ms. Krumbein testified she interviewed S.E. on March 14, 2010 (*id.* at 208).  She testified she first spoke to Terrie Webb, who told her that S.E. said she had been touched in the front and the back (*id.*).  Ms. Krumbein testified S.E. told her that the molestation occurred at "the old house" (*id.* at 210).  Krumbein testified she did not

recall ever hearing the name "Christina" (*id.*). Ms. Krumbein testified that S.E. told her that neither her mother nor stepfather smoked (*id.* at 212). Ms. Krumbein testified that Danielle Levi never mentioned leaving the house for a nail appointment (*id.* at 212–13).

The defense called Danielle Levi to the stand to ask if Crowder ever lived at their house during the spring or summer of 2009, and Levi responded no (ECF No. 15-3 at 221). On cross-examination, Ms. Levi testified that Crowder stayed at the house a lot and occasionally spent the night (*id.*).

The defense called Williams Davis, who was Abe Levi's friend and Crowder's "brother-in-law" (ECF No. 15-3 at 223). Mr. Davis testified he stayed at the Levis' home for two months in 2009 (*id.*).

Crowder testified and denied he ever was at the Levis' home alone with S.E., and he denied he ever inappropriately touched S.E. (ECF No. 15-3 at 227–32). Crowder admitted he spent the night at the Levi's home and spent the night at Christina's house when he and Abe Levi went fishing (*id.* at 233).

Following the Supreme Court analysis in *Calderon v. Thompson*, in order to find that the "newly discovered" impeachment evidence (i.e., Ms. Kahl's admissions in the *Forbes* deposition that she did not always follow certain state-mandated CPT guidelines) would probably have altered the outcome of Crowder's trial, the court

would have to assume, first, that there was little evidence of the sexual molestation apart from S.E.'s statements during Ms. Kahl's interview; and second, that the jury accepted the product of Ms. Kahl's interview without reservation.

The first assumption is belied by the evidence recited above, specifically, the testimony of Terrie Webb and Abe Levi regarding S.E.'s description of the molestation **before** Ms. Kahl's interview.   The second assumption is belied by defense counsel's eliciting the following admissions from Ms. Kahl:  (1) that she did not determine whether S.E. understood the importance of telling the truth and only "obligated" S.E. to tell the truth; (2) that when a child is asked the same question more than once, the child may think she is not giving the correct response and thus change her response; and (3) that on more than one occasion during her interview with S.E., she asked S.E. a question more than once, and S.E. could have inferred that her first answer was not acceptable.  Most importantly, the jury assessed the credibility of S.E.'s disclosures firsthand by listening to her in-court testimony and observing her demeanor on the stand.

Considering the evidence presented at Crowder's trial, Crowder has failed to show that it is more likely than not that any reasonable juror would have had reasonable doubt about Crowder's guilt if the jury had been presented with the "newly discovered" impeachment evidence.  Because Crowder has not made a

"credible showing of actual innocence," he is not entitled to a merits review of his federal habeas claims.

## III.    CONCLUSION

Crowder's federal habeas petition was not filed within the one-year statutory limitations period; and he has not shown he is entitled to federal review of his habeas claims through the "actual innocence" gateway recognized in *McQuiggin*. Therefore, the State's motion to dismiss should be granted, and the amended habeas petition dismissed with prejudice as untimely.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336  (2003) (quoting § 2253(c)(2)). "At the COA stage, the

only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, — U.S.—, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1. That Respondent's motion to dismiss (ECF No. 8) be **GRANTED**.

2. That the amended petition for writ of habeas corpus (ECF No. 4) be **DISMISSED with prejudice** as untimely.

3. That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 15<u>th</u> day of July 2021.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## **NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**